The Honorable Samuel J. Steiner
Chapter 15
Hearing Date: Friday, May 7, 2010
Hearing Time: 11:00 a.m.
Hearing Location: Seattle – Room 8206

FILED
Western D... ....of Washington
... Bank

MAY 0 7 2010

U.S. Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re

BIG NEVADA, INC., *et al.*,

    Debtors in a Foreign Proceeding.

Case No. 09-13569 (SJS)

(Jointly Administered)

ORDER (1) APPROVING FORM OF
PURCHASE AGREEMENT,
(2) APPROVING PROCEDURES FOR
SALE OF DEBTORS' ASSETS,
(3) APPROVING ASSUMPTION AND
ASSIGNMENT PROCEDURES,
(4) APPROVING NOTICE
PROCEDURES AND FORMS OF
NOTICE, AND (5) GRANTING OTHER
RELIEF

    THIS MATTER comes before the Court on the motion (the "Motion") filed by Grant Thornton Limited, as receiver and foreign representative (the "Receiver"), for entry of an order (1) approving the form of purchase agreement attached hereto as Exhibit A (the "Purchase Agreement"), including the break-up fee provided for therein, (2) approving the proposed sale procedures attached hereto as Exhibit B, including scheduling a bid deadline, auction date, and sale hearing date (the "Sale Procedures"), (3) establishing procedures for assuming and

ORDER APPROVING FORM OF ASSET PURCHASE AGREEMENT
AND GRANTING OTHER RELIEF (09-13569) - 1
DWT 13820087v13 0090149-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200  1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150   Fax (206) 757-7700

1  assigning executory contracts and unexpired leases (the "Assumption and Assignment

2  Procedures"), (4) fixing notice procedures and approving forms of notice, and (5) granting

3  other relief. The Motion is filed in connection with the jointly-administered chapter 15 cases of

4  each of the following Washington corporations for which Grant Thornton is serving as

5  Receiver:

6          Big Nevada, Inc.
           Gameco, Inc.
7          Gaming Consultants, Inc.
           Gaming Management, Inc.
8          Golden Nugget Tukwila, Inc.
           Hollydrift Gaming, Inc.
9          Little Nevada, Inc.
           Little Nevada II, Inc.
10         Little Nevada III, Inc.
           Mill Creek Gaming, Inc.
11         Royal Casino Holdings, Inc.
           Shoreline Gaming, Inc.
12         Shoreline Holdings, Inc.
           Silver Dollar Mill Creek, Inc.
13         Snohomish Gaming, Inc.

14 (collectively, the "Washington Subsidiaries"). The Court has considered the Motion, the

15 Declarations of Mark Wentzell and Constantine Dakolis filed concurrently with the Motion, the

16 Declaration of Robert Sturges filed in support of the Motion, each objection to the Motion and

17 papers filed in support thereof, and the other matters of record in these jointly-administrated

18 cases and in case number 09-13567, including, without limitation, the Declaration of

19 Constantine Dakolis filed on April 16, 2009 and the Declaration of Jeff Slahor filed on June 16,

20 2009, as well as the argument and statements of counsel presented at the hearing. Capitalized

21 terms not otherwise defined in this Order shall have the same meanings as set forth in the

22 Purchase Agreement.

23         BASED ON THE FOREGOING, the Court makes the following findings of fact and

24 conclusions of law:

25         A.      This Court has jurisdiction over these chapter 15 cases and the parties and

26 properties affected thereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion is a core

27 ORDER APPROVING FORM OF ASSET PURCHASE AGREEMENT
   AND GRANTING OTHER RELIEF (09-13569) - 2
   DWT 13820087v13 0090149-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200   1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150   Fax (206) 757-7700

proceeding pursuant to 28 U.S.C. § 157(b)(2)(M), (N), (O), and (P). Venue is properly located in this district pursuant to 28 U.S.C. § 1410. The assets of the Washington Subsidiaries that are the subject of the Motion are located within the territorial jurisdiction of the United States and accordingly, §§ 363, 549 and 552 of the Bankruptcy Code are applicable to the transfer of such assets.

B.      Due, sufficient, and adequate notice of the relief requested in the Motion and granted herein has been given to parties in interest.

C.      In the Motion and supporting papers, the Receiver has established good and sufficient reasons for (1) approving the form of the Purchase Agreement, (2) authorizing payment of a break-up fee in the amount of $1,000,000 (the "Break-Up Fee") payable to NG Washington II, LLC ("Nevada Gold") pursuant and subject to the terms of the Purchase Agreement, (3) approving the Sale Procedures, (4) approving the Assumption and Assignment Procedures, (5) fixing notice procedures and approving forms of notice, and (6) granting the other relief provided for herein. Among other things, the Receiver has engaged in an extensive process to market the assets of the Washington Subsidiaries to third parties over a period of several months. Nevada Gold is one of the potential purchasers identified by the Receiver as part of its process. The Receiver has engaged in arms-length negotiations with Nevada Gold concerning the terms of the Purchase Agreement. Fortress has participated in those negotiations, and both the Receiver and Fortress believe that the transactions contemplated in the Purchase Agreement are fair and reasonable under the circumstances. In addition, both the Receiver and Fortress believe that given the extensive marketing effort to date, the proposed Sales Procedures, Assumption and Assignment Procedures, notice procedures and other relief sought in the Motion are reasonable under the circumstances, and in the best interests of the Washington Subsidiaries.

D.      The Sale Procedures are reasonably calculated to produce an arms'-length bidding process for obtaining the highest and best bid available from a good-faith purchaser.

ORDER APPROVING FORM OF ASSET PURCHASE AGREEMENT
AND GRANTING OTHER RELIEF (09-13569) - 3
DWT 13820087v13 0090149-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150   Fax (206) 757-7700

Any Successful Bidder (as defined below) that complies in good faith with the Sale Procedures shall be deemed by the Court at the Sale Hearing (as defined below) to be a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code, and entitled to all of the protections thereof.

E.    Fortress Credit Funding II, L.P. ("Fortress") has consented to entry of this Order, including all the relief provided for herein.

F.    To the extent that Nevada Gold becomes entitled to receive payment of the Break-Up Fee pursuant to the Purchase Agreement, such expense shall be (i) an actual and necessary cost and expense of preserving the Washington Subsidiaries' estates, within the meaning of section 503(b) of the Bankruptcy Code, (ii) of substantial benefit to the Washington Subsidiaries' estates, (iii) reasonable and appropriate considering, among other things, the size and nature of the proposed sale of assets pursuant to the Purchase Agreement (the "Sale"), the efforts that have been and will be expended by Nevada Gold notwithstanding that the proposed Sale is subject to higher or better offers for the assets to be sold pursuant to the Purchase Agreement (the "Acquired Assets"), and the prevailing custom and practice applicable to non-bankruptcy sale transactions of similar type and size, and (iv) necessary to ensure that Nevada Gold will continue to pursue its proposed acquisition of the Acquired Assets. Absent further order of this Court, no Qualified Bidder (as defined below) other than the Nevada Gold shall be entitled to a break-up fee or similar payment.

G.    The bid procedures and overbid protections afforded to Nevada Gold under the Purchase Agreement are reasonable and appropriate and represent the best method for maximizing the return for the Acquired Assets.

H.    The Assumption and Assignment Procedures, including procedures for addressing objections to assumption and assignment and proposed cure amounts, are reasonable and appropriate.

I.    This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).

ORDER APPROVING FORM OF ASSET PURCHASE AGREEMENT
AND GRANTING OTHER RELIEF (09-13569) - 4
DWT 13820087v13 0090149-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200   1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150 · Fax (206) 757-7700

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.     All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, hereby are overruled on the merits and denied.

2.     Pursuant to sections 105, 363, 365, 1520, and 1525 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 6002, 6004, 6006, 9007, and 9029, the Motion is granted.

## Form of Purchase Agreement/Sale Procedures

3.     The form of the Purchase Agreement attached hereto as Exhibit A is hereby approved and shall be used by all Qualified Bidders, as defined in the Sale Procedures, provided, however, that Fortress will not be required to provide financial accommodations to any Qualified Bidder other than Nevada Gold, and paragraph 3 of the Purchase Agreement shall be modified to reflect that the Purchase Price shall be all cash absent the express written consent of Fortress to provide financing in connection with a Qualified Alternative Bid.

4.     The Sale Procedures attached hereto as Exhibit B are hereby approved and shall govern all bids and sale procedures relating to the Sale.  The Receiver is authorized to take any and all actions necessary or appropriate to implement the Sale Procedures.

5.     Unless the Receiver notifies this Court before 5:00 p.m. (Pacific time) on May 27, 2010 that it wishes to terminate the Sale, the Court shall conduct a hearing to consider approving the Sale (the "Sale Hearing") on Friday, May 28, 2010, at 9:30 A.m. (Pacific Pᴬ time).

## Assumption and Assignment Procedures

6.     Section 365(a), (b) and (f) of the Bankruptcy Code are hereby made applicable to these cases. The Assumption and Assignment Procedures attached hereto as Exhibit C shall govern the assumption and assignment of executory contracts and unexpired leases in connection with the Sale.

ORDER APPROVING FORM OF ASSET PURCHASE AGREEMENT
AND GRANTING OTHER RELIEF (09-13569) - 5
DWT 13820087v13 0090149-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150    Fax (206) 757-7700

**Notices**

7.     The notice of the Sale Hearing (the "Sale Notice"), substantially in the form attached hereto as Exhibit D, is hereby approved as reasonably calculated to provide creditors and parties in interest with proper notice of the proposed Sale Procedures and Sale.

8.     The Assumption and Assignment Notice, substantially in the form attached hereto as Exhibit E (the "Assumption and Assignment Notice"), is hereby approved as reasonably calculated to provide all counterparties to the Assumed Contracts and Assumed Leases with proper notice of the assumption and assignment of their respective executory contracts or unexpired leases, the amount, timing and nature of any cure relating thereto, the conditions for provision of adequate assurance of future performance, and the Assumption and Assignment Procedures.

9.     The notices described in paragraphs 7 and 8 are approved and shall be good and sufficient, and no other or further notice shall be required if given as follows:

(a)     The Receiver files with the Court and serves through the Court's ECF system copies of the Sale Notice, the Sale Motion (and all papers filed in support of the Sale Motion), and the Assumption and Assignment Notice on all parties appearing electronically in these cases, including without limitation, the United States Trustee;

(b)     The Receiver serves, within three days after entry of this Order (the "Mailing Deadline"), by first-class mail, postage prepaid, or other method reasonably calculated to provide notice, copies of the Sale Notice on (i) all parties known to the Receiver who previously expressed an interest in acquiring the assets (or stock) of one or more of the Washington Subsidiaries, and (ii) each person identified on the master mailing list kept by the clerk of the Court in these Cases pursuant to Local Bankruptcy Rule 2002-1(a), including without limitation all known creditors of the Washington Subsidiaries and all persons requesting special notice pursuant to Bankruptcy Rule 2002(i), provided, however, that the

ORDER APPROVING FORM OF ASSET PURCHASE AGREEMENT
AND GRANTING OTHER RELIEF (09-13569) - 6
DWT 13820087v13 0090149-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200   1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150   Fax (206) 757-7700

1  Receiver shall not be required to separately mail copies of the Sale Notice to any party that

2  receives electronic notice through the Court's ECF system;

3         (c)     The Receiver serves on or before the Mailing Deadline by first-class

4  mail, postage prepaid, or other method reasonably calculated to provide notice, copies of the

5  Sale Notice, the Sale Motion (and all papers filed in support of the Sale Motion), and the

6  Assumption and Assignment Notice, on (i) all parties known by the Receiver to claim any lien

7  against or interest in any property of the Washington Subsidiaries being sold, (ii) the United

8  States attorney for the Western District of Washington, and (iii) all non-debtor parties to the

9  Assumed Contracts or the Assumed Leases, provided, however, that the Receiver shall not be

10  required to separately mail copies of the foregoing to any party that receives electronic notice

11  through the Court's ECF system.

12         (d)     Within three days after the identification by the Receiver of a Successful

13  Bidder other than Nevada Gold, the Receiver files with the Court and serves by first-class mail,

14  postage prepaid, or other method reasonably calculated to provide notice, an amended

15  Assumption and Assignment Notice (identifying the Successful Bidder other than Nevada

16  Gold) on the non-debtor parties to the Assumed Contracts and Assumed Leases to be assumed

17  and assigned to the Successful Bidder pursuant to the Purchase Agreement, provided, however,

18  that the Receiver shall not be required to separately mail copies of the foregoing to any party

19  that receives electronic notice through the Court's ECF system.

20  **<u>Other Relief</u>**

21      10.     The failure of any objecting person or entity to timely file its objection shall be a

22  bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, to the

23  consummation and performance of the Sale, or the assumption and assignment of any

24  executory Contract or unexpired lease, upon the terms and conditions set forth in the

25  Assumption and Assignment Notice.

26

27  ORDER APPROVING FORM OF ASSET PURCHASE AGREEMENT
AND GRANTING OTHER RELIEF (09-13569) - 7
DWT 13820087v13 0090149-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150    Fax (206) 757-7700

11.     To the extent that Nevada Gold shall become entitled to receive payment of the Break-Up Fee pursuant to the Purchase Agreement, such Break-Up Fee shall be payable from the proceeds of sale following closing of the sale to the Successful Bidder and shall have priority over and be paid prior to any distribution to Fortress.

12.     The U.S. trustee shall appoint a consumer privacy ombudsman pursuant to sections 332 and 363(b)(1) of the Bankruptcy Code as soon as practicable.

13.     The Receiver is authorized and directed to reimburse Nevada Gold for its expenses as set forth in the Purchase Agreement.

14.     As provided in Bankruptcy Rules 6004(l) and 6006(d), and notwithstanding Bankruptcy Rule 7062, this Order shall be effective and enforceable immediately upon entry. Time is of the essence in obtaining the highest and best value for the assets of the Washington Subsidiaries. Therefore, the stays provided for under Bankruptcy Rules 6004(h), 6006(d), and 7062 shall not apply.

15.     The provisions of this Sale Order are non-severable and mutually dependent.

DATED this _7_ day of May, 2010.

_____
UNITED STATES BANKRUPTCY JUDGE

Presented by:

Davis Wright Tremaine LLP
Attorneys for Grant Thornton Limited, as
Receiver and Foreign Representative
of the Washington Subsidiaries

By _____
Ragan L. Powers, WSBA #11935
C. Keith Allred, WSBA #6566
Hugh R. McCullough, WSBA #41435

ORDER APPROVING FORM OF ASSET PURCHASE AGREEMENT
AND GRANTING OTHER RELIEF (09-13569) - 8
DWT 13820087v13 0090149-000001

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200    1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150    Fax (206) 757-7700

# EXHIBIT A

## Form of Purchase Agreement

, Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200 · 1201 Third Avenue
Seattle, Washington 98101-3045
(206) 622-3150    Fax (206) 757-7700

**ASSET PURCHASE AGREEMENT**


**by**


**NG Washington II, LLC**
**as Buyer**


**and**


**Grant Thornton Ltd.**
**as Receiver**
**for**
**Big Nevada, Inc.**
**Gameco, Inc.**
**Gaming Consultants, Inc.**
**Gaming Management, Inc.**
**Golden Nugget Tukwila, Inc.**
**Hollydrift Gaming, Inc.**
**Little Nevada, Inc.**
**Mill Creek Gaming, Inc.**
**Royal Casino Holdings, Inc.**
**and**
**Silver Dollar Mill Creek, Inc.**


Date: April 14, 2010

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of April 14, 2010 (the "Effective Date"), by (i) NG Washington II, LLC, a Washington limited liability company ("Buyer"), and (ii) Grant Thornton Limited in its capacity as court-appointed receiver and not in its personal capacity (the "Receiver") for Big Nevada, Inc., a Washington corporation ("Big Nevada"), Gameco, Inc., a Washington corporation ("Gameco"), Gaming Consultants, Inc., a Washington corporation ("Gaming Consultants"), Gaming Management, Inc., a Washington corporation ("Gaming Management"), Golden Nugget Tukwila, Inc., a Washington corporation ("Golden Nugget"), Hollydrift Gaming, Inc., a Washington corporation ("Hollydrift"), Little Nevada, Inc., a Washington corporation ("Little Nevada"), Mill Creek Gaming, Inc., a Washington corporation ("Mill Creek"), Royal Casino Holdings, Inc., a Washington corporation ("RCH"), and Silver Dollar Mill Creek, Inc., a Washington corporation ("Silver Dollar", and together with Big Nevada, Gameco, Gaming Consultants, Gaming Management, Golden Nugget, Hollydrift, Little Nevada, Mill Creek, RCH, and Silver Dollar, each a "Company" and collectively the "Companies").

## RECITALS

A.    On April 15, 2009, Evergreen Gaming Corporation, a British Columbia corporation ("Evergreen"), and nineteen (19) of Evergreen's Canadian and U.S. affiliates each filed a petition in the Vancouver Registry of the Supreme Court of British Columbia (the "Canadian Court") under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c.C-36 and C-44 (the "CCAA") and the Business Corporations Act, S.B.C. 2002, c.57 (the "CCAA Proceeding"). Deloitte & Touche, Inc. was initially appointed monitor of those companies in the CCAA Proceeding (the "Original Monitor").

B.    The U.S. affiliates of Evergreen that filed for protection in the CCAA Proceeding include Washington Gaming, Inc., a Washington corporation ("WGI"), and the Companies.

C.    On April 15, 2009, the Original Monitor in the CCAA Proceeding filed petitions on behalf of Evergreen, WGI and certain subsidiaries of WGI (including the Companies) in the United States Bankruptcy Court for the Western District of Washington (such court the "Bankruptcy Court" and such proceeding the "U.S. Proceeding") seeking recognition of the CCAA Proceeding as a foreign main proceeding under Sections 1504 and 1515 of the United States Bankruptcy Code, 11. U.S.C. §§101 et seq. (the "U.S. Bankruptcy Code"), and recognition of the Original Monitor as foreign representative of Evergreen, WGI and certain subsidiaries of WGI (including the Companies), as defined in 11 U.S.C. §101(23).

D.    On June 24, 2009, with the consent of Evergreen and WGI, the Canadian Court entered an order appointing Grant Thornton Limited as receiver over all of the assets and undertakings of certain subsidiaries of Evergreen.

E.    On July 3, 2009, with the consent of Evergreen and WGI, the Canadian Court entered: (i) an order approving a settlement agreement among Evergreen, WGI, certain subsidiaries of WGI (including the Companies), Mountlake Gaming, Inc., Riverside Casino, Inc., Norman Osatuik and Cory Coyle, on the one hand, and Fortress Credit Corp. ("FCC"), Fortress

Credit Opportunities I LP ("FCO") and Fortress Credit Funding II LP ("FCF," and collectively with FCC and FCO, "Fortress"), on the other; and (ii) an order (the "Receivership Order") appointing Grant Thornton Limited as the Receiver of the assets and undertakings of certain subsidiaries of WGI (including the Companies) and replacing Deloitte & Touche, Inc. with the Receiver as the monitor in respect of the Companies.

F.     On July 6, 2009 (the "Receivership Order Date"), the Bankruptcy Court entered orders (i) recognizing the CCAA Proceeding as a foreign main proceeding under Section 1515 of the U.S. Bankruptcy Code; (ii) recognizing the Receiver as the foreign representative of certain subsidiaries of WGI (including the Companies); and (iii) retaining the Original Monitor as foreign representative of WGI.

G.     The Receiver desires to sell to Buyer, and Buyer desires to purchase from the Receiver, all of the assets (other than Excluded Assets) of the Companies.  In addition, in connection with such sales and purchases, Buyer desires to assume certain real property leases and executory contracts to which the Companies are parties.

H.     Each of the Companies is engaged directly or indirectly in the business of state-licensed gambling activities, including the businesses engaged in by the Companies that are the subject of this Agreement (collectively, the "Businesses" and each a "Business").  The Business engaged in by each Company is more fully described in Schedule H.

I.     The Receiver's obligations under this Agreement, and the transactions contemplated by this Agreement are expressly subject to the approval of the Canadian Court and the Bankruptcy Court and will be consummated only pursuant to orders to be entered in the CCAA Proceeding and the U.S. Proceeding.

## AGREEMENT

The parties, intending to be legally bound, and based upon the mutual covenants and agreements contained herein, and for such further good and valuable consideration the receipt and sufficiency of which are hereby mutually acknowledged, agree as follows:

1.     **DEFINITIONS AND INTERPRETATION**

1.1     DEFINED TERMS

For purposes of this Agreement, capitalized terms used in this Agreement have the meanings specified or referred to in Schedule 1.1.

1.2     INTERPRETATION

The following rules of interpretation apply throughout this Agreement:

(a)     The word "or" is used in the inclusive sense of "and/or".  The word "including" (and "include" and variations thereof) means including without limiting the generality of any description preceding such term.  Unless otherwise specified, the words "hereof," "herein,"

DWT 14225943v13 0090149-000001

"hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.

(b)     The headings in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Except as otherwise indicated, all references in this Agreement to "Sections," "Exhibits" and "Schedules" are intended to refer to Sections of this Agreement and Exhibits and Schedules to this Agreement.

(c)     Whenever used herein, unless otherwise specified, the singular number shall include the plural, the plural shall include the singular, and the use of any gender shall be applicable to both genders.

(d)     Unless otherwise specified, all references to monetary amounts are to currency of the United States of America.

(e)     The phrase "the parties hereto" refers to Buyer and the Receiver, and the phrase "the other party or parties hereto" refers to Buyer, on the one hand, or the Receiver, on the other hand.

(f)     When calculating the period of time before which, within which or following which any act is to be done or step is to be taken under this Agreement, the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(g)     The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual agreement; any Law, regulation, or rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

## 2.     SALE OF ASSETS

### 2.1     SALE OF ASSETS

Subject to the terms and conditions set forth in this Agreement, the Receiver will sell, assign, transfer, convey and deliver to Buyer, and Buyer will purchase and acquire from the Receiver, at the Closing, all right, title and interest of each of the Companies in, to and under all of the properties, assets and rights owned by the Companies and used in the Businesses of every kind, character and description, whether tangible, intangible, real, personal or mixed and wheresoever located, whether carried on the books of the Companies or not carried on the books of the Companies due to expense, full depreciation or otherwise, other than Excluded Assets, but including (i) those Tangible Personal Property assets listed on Schedule 2.1, (ii) customer and player lists for the Casinos (and any data or documentation relating to this clause (ii) that is (A) in the Sonoma system database maintained by the Companies and/or (B) in the Receiver's possession), and (iii) Current Assets as set forth on the Final Working Capital (the assets so purchased and acquired, collectively, the "Purchased Assets"). The Purchased Assets will be transferred to Buyer free and clear of all interests pursuant to Section 363 of the U.S. Bankruptcy Code, and to the extent that assets to be transferred are Executory Contracts or leases, such Executory Contracts or leases will be assumed and assigned pursuant to Section 365 of the U.S.

DWT 14225943v13 0090149-000001

Bankruptcy Code or other applicable Law (as more fully described in Sections 2.3 and 2.4 below).

2.2    EXCLUDED ASSETS

Notwithstanding anything to the contrary in this Agreement, the Purchased Assets shall exclude all of the following (collectively, the "Excluded Assets"): (i) subject to Section 9.8, inventories of beer, wine and spirits in each case if and to the extent that the requisite approval of the WSGC and WSLCB, as applicable, to the sale thereof to Buyer has not been obtained; (ii) any Contract that does not become an Assumed Contract pursuant to Buyer's designation rights set forth in Section 2.3 (including, without limitation, any Contract having a consent requirement in favor of the counterparty thereto, which such consent cannot be obtained or, alternatively, for which court authority obviating the need for such consent cannot be obtained ) (collectively, "Excluded Contracts"), and as to any such Excluded Contract that is an Executory Contract, all assets subject thereto; (iii) all securities, whether capital stock or debt securities, of any Company or any other entity; (iv) all rights and claims in or to any refunds or credits of or with respect to any Taxes, assessments or similar charges paid by or on behalf of any Company; (v) Tax Returns and tax records, minute books, stock transfer books and corporate seals of any Company; (vi) all suits, rights, claims and causes of action of any Company against any other party, including claims against any current or former officer, director, employee, shareholder, principal, agent or representative of such Company, other than Assumed Claims; (vii) subject to applicable Law, all preference or avoidance claims and actions of any Company arising under Chapter 5 of the U.S. Bankruptcy Code or comparable state Law; (viii) all instruments, receivables, accounts receivable and unbilled costs and fees outstanding or owing between or among the Companies or between any Company and other Affiliate of Evergreen and all causes of action relating or pertaining to the foregoing; (ix) refunds and recoveries under any insurance policies relating to the Purchased Assets or the operation of the Businesses prior to the Closing; (x) any and all consents, approvals, licenses or permits issued to the Companies by Governmental Authorities that are not transferable and (xi) those additional assets, if any, listed on Schedule 2.2.

For the avoidance of doubt, the Purchased Assets also do not include (i) the Receiver's rights under this Agreement or any cash and non-cash consideration payable or deliverable to the Receiver by Buyer pursuant to the provisions hereof; and (ii) Player Supported Jackpots, which Buyer acknowledges are not assets of the Companies and which will, in accordance with applicable Washington Law, be distributed by the Receiver to the appropriate players or donated to the Washington State Council on Problem Gambling, as determined by the Receiver.

2.3    ASSUMED REAL PROPERTY LEASES: EXECUTORY CONTRACT DESIGNATION

(a)    Buyer hereby confirms to the Receiver that Buyer shall assume those Real Property Leases listed on Schedule 2.3(a) attached hereto (the "Assumed Real Property Leases") subject only to the express conditions set forth herein. No later than five (5) Business Days after the Effective Date, Buyer shall deliver to the Receiver a written notice (the "EC Notice") (i) designating each Executory Contract proposed to be assigned to and assumed by Buyer pursuant to this Agreement, at Buyer's sole discretion, and (ii) identifying the Undisputed Cure Costs with respect to such Executory Contracts.

4

On or prior to the Designation Deadline, Buyer shall notify the Receiver in writing of those Executory Contracts (other than the Assumed Real Property Leases), if any, set forth on the EC Notice to be assumed by the Receiver and assigned to and assumed by Buyer pursuant to this Agreement (such Executory Contracts other than the Assumed Real Property Leases are collectively, the "Assumed Contracts").

(b)     In connection with the motion to approve this Agreement and the transactions contemplated hereby, the Receiver shall move the Bankruptcy Court for an order approving assumption and assignment of the Assumed Real Property Leases and Assumed Contracts and fixing the amounts of cure in the amounts of the Undisputed Cure Costs (the "Assumption and Cure Motion"). In cases in which the Receiver is unable to determine that any monetary default exists, the Assumption and Cure Motion shall seek to fix the cure amount at zero for such Assumed Real Property Lease or such Assumed Contract. To the extent a counterparty to an Assumed Real Property Lease or an Assumed Contract objects or otherwise challenges the cure costs as proposed by the Receiver and asserts a different monetary amount that must be paid, and/or nonmonetary obligations that otherwise must be satisfied, including pursuant to Section 365(b)(1)(A) and (B) of the U.S. Bankruptcy Code, in order for Buyer to assume such Assumed Real Property Lease or Assumed Contract pursuant to this Agreement, the difference between the Undisputed Cure Costs determined by the Receiver and such amounts and/or nonmonetary obligations determined by such counterparty shall be referred to as the "Disputed Cure Costs".

(c)     Buyer shall be obligated to pay at or prior to Closing all Undisputed Cure Costs, if any, associated with the assumption of the Assumed Real Property Leases and the Assumed Contracts and shall be obligated to deposit at or prior to Closing with the Receiver in trust any and all Disputed Cure Costs. The Disputed Cure Costs shall only be paid by Buyer from funds deposited by Buyer with the Receiver pursuant to the immediately preceding sentence, in whole or in part, upon resolution of disputes regarding the amount of cure pursuant to Order of the Bankruptcy Court or mutual agreement between Buyer and the counterparty to the applicable Assumed Real Property Lease or Assumed Contract. The Receiver and Buyer shall cooperate in reaching a prompt resolution of any such Disputed Cure Costs remaining after Closing.

(d)     The Receiver shall use commercially reasonable efforts to cooperate with Buyer in its efforts to reduce the Disputed Cure Costs, including, without limitation, commercially reasonable efforts to provide Buyer with access to relevant business records, personnel and equipment of the Companies in order to allow Buyer to assist with evaluating the Disputed Cure Costs, in each case at Buyer's sole cost and expense.

(e)     To the extent that the Bankruptcy Court determines that adequate assurances are required from Buyer with respect to any Assumed Real Property Lease or Assumed Contract, Buyer shall provide such commercially reasonable assurances at its sole cost and expense.

2.4     ASSIGNMENT OF CONTRACTS AND RIGHTS; ASSIGNMENT OF LEASES; ASSIGNMENT OF CERTAIN OTHER EXECUTORY CONTRACTS

The Purchased Assets (including the Assumed Real Property Leases and the Assumed Contracts) will be sold, assigned to, transferred to and assumed by Buyer pursuant to the Receivership Order and Sections 363, 365 and other applicable provisions of the U.S. Bankruptcy Code as of the Closing.

The Receiver shall use commercially reasonable efforts, and Buyer shall cooperate with the Receiver, including by providing the information described in Section 9.4(f), to obtain any required consents of any third party or court approvals required for the assignment of any Assumed Real Property Lease, Assumed Contract or other Purchased Asset. Buyer shall pay all costs and expenses incurred by the Receiver in obtaining such consents, provided that Buyer approves of such costs and expenses in advance, which approval shall not be unreasonably withheld. With the prior written consent of the Receiver, Buyer may have direct communications with any such third parties for the sole purpose of seeking to obtain any such consent(s). To the extent the Receiver is unable to obtain any required consent or court approvals for the assignment of any Assumed Real Property Lease(s), the Receiver may take such other action as it deems appropriate, including, without limitation, pursuant to the U.S. Bankruptcy Code, to effect an assignment of such Assumed Real Property Lease(s) to Buyer.

Except as otherwise provided in Section 2.6, but notwithstanding any other provision of this Agreement (other than Section 2.6) to the contrary, if the consent of a third party is required as to the assignment of any particular Executory Contract or other asset intended to be a Purchased Asset (or any right thereunder), other than an Assumed Real Property Lease, and such consent is not obtained or such assignment is not attainable over the objection of that party pursuant to applicable Law (including, without limitation, the CCAA, s. 47 of the Bankruptcy and Insolvency Act (Canada), s. 39 of the Law and Equity Act (British Columbia) and Section 105, 363 or 365 of the U.S. Bankruptcy Code), then such Executory Contract or other asset shall not be a Purchased Asset and shall not be transferred hereunder, but the Closing shall proceed, without adjustment to the Purchase Price, with respect to the remaining Purchased Assets; *provided, however,* that if such Executory Contract that is not transferred is an Assumed Real Property Lease, then the Purchase Price payable to the Receiver shall be reduced dollar for dollar by the amount allocated to the Casino to which such Assumed Real Property Lease relates as set forth on Schedule 2.6(b).

## 2.5    INSTRUMENTS OF TRANSFER; ASSUMPTION OF LIABILITIES

The sale, assignment, transfer, conveyance and delivery of the Purchased Assets to Buyer shall be made by the bills of sale, assignments and other instruments of assignment, transfer and conveyance provided for in Section 4 and such other instruments as may reasonably be requested by Buyer to sell, transfer, convey, assign and deliver the Purchased Assets to Buyer. The assumption of the Assumed Liabilities by Buyer shall be made by the Bill of Sale and Assignment and Assumption Agreement provided for in Section 4 and such other instruments as may reasonably be requested by the Receiver to evidence assumption of the Assumed Liabilities by Buyer.

## 2.6    ELECTION OF MULTIPLE CLOSINGS

Notwithstanding any other provision of this Agreement, and whether or not such other provision references this Section 2.6, if the assumption and assignment of the Assumed Real Property Leases have been obtained pursuant to the Approval Orders as to one or more, but fewer than all, of the Casinos, then provided that if the Receiver or Buyer so elects upon written notice to the other party:

6

(a)     An initial Closing shall occur (on and subject to the terms and conditions set forth herein) only as to the Casinos as to which the assignment and assumption of such Assumed Real Property Leases have been, or at such Closing will be, obtained, and in connection therewith:

(i)     Title shall be transferred to Buyer at such initial Closing only as to those Purchased Assets (including without limitation those Assumed Real Property Lease(s) and those Assumed Contracts), and Buyer shall assume only those Assumed Liabilities, constituting or located at, or otherwise related to, the Casino or Casinos described in this Section 2.6(a);

(ii)     Buyer shall pay at such initial Closing only the Undisputed Cure Costs, and shall be obligated to deposit with the Receiver in trust, or otherwise secure payment of, any and all Disputed Cure Costs, relating to those Assumed Real Property Lease(s) and Assumed Contract(s) assumed by Buyer at such initial Closing;

(iii)     The amount payable by the Buyer to the Receiver at such initial Closing shall be in adjusted and paid in accordance with Section 3.1(c); and

(iv)     The Working Capital Adjustment Amount shall be separately calculated and paid in accordance with Section 3.4 as to the Casino or Casinos described in this Section 2.6(a); and

(b)     At such time or times as all conditions set forth in Section 2.6(c) to the consummation of the sale of any one or more Casinos not sold to and purchased by Buyer at the initial Closing pursuant to Section 2.6(a), then upon not less than five (5) Business Days' prior written notice given by the Receiver or Buyer to the other party, an additional Closing (each such additional Closing an "Extension Closing") shall be held as to each Casino as to which such additional assignment and assumption of Assumed Real Property have then been obtained, and in connection therewith:

(i)     Title shall be transferred to Buyer at such Extension Closing as to those Purchased Assets (including without limitation those Assumed Real Property Lease(s) and those Assumed Contracts), and Buyer shall assume those Assumed Liabilities, constituting or located at, or otherwise related to, the Casino or Casinos described in this Section 2.6(b) as to which such Extension Closing relates;

(ii)     Buyer shall pay at such Extension Closing only the Undisputed Cure Costs, and shall be obligated to deposit with the Receiver in trust, or otherwise secure payment of, any and all Disputed Cure Costs, relating to those Assumed Real Property Lease(s) and Assumed Contract(s) assumed by Buyer at such Extension Closing;

(iii)     The amount payable by the Buyer to the Receiver at such Extension Closing shall be adjusted and paid in accordance with Section 3.1(c); and

(iv)     The Working Capital Adjustment Amount shall be separately calculated and paid in accordance with Section 3.4 as to the Casino or Casinos described in this Section 2.6(b) as to which such Extension Closing relates.

If the Purchased Assets constituting or located at more than one Casino are not sold to Buyer at the initial Closing, the Receiver or Buyer may determine (with written notice of such determination being given to the other party) that such other Casinos shall be sold to Buyer on a seriatim basis and at multiple Extension Closings (subject in each case to the satisfaction of all of the conditions set forth in Section 2.6(c) as to the applicable Casino) or that a single Extension Closing shall be held at such time as all conditions to the sale of all such Casinos set forth in Section 2.6(c) have been or will be satisfied; *provided, however*, that notwithstanding anything herein to the contrary:

(A)     The initial Closing shall include: (x) Sea-Tac Casino; (y) at least three (3) of the following Casinos: GN Tukwila Casino, Millcreek Casino, Royal Casino, and Renton Casino; and (z) the assets that are among the Purchased Assets (including but not limited to the Assumed Contracts) of Gameco, Gaming Consultants and Gaming Management; each on and subject to the terms and conditions hereof;

(B)     The Casino, if any, not acquired by Buyer pursuant to clause 2.6(b)(A)(y), the Club Hollywood Casino, and the SD Tukwila Casino shall be sold to Buyer, on and subject to the terms and conditions hereof, only concurrently with, or after, Buyer's acquisition of the Casinos and other Purchased Assets referred to in clause 2.6(b)(A), in any order and pursuant to one or more Extension Closings.

If more than one Closing is or is provided to be held pursuant to this Section 2.6, then except where the context otherwise requires, all of the provisions of this Agreement relating to the "Closing" and the "Closing Date" and the actions to be taken by the parties in connection therewith shall apply *mutatis mutandis* to the initial Closing and each Extension Closing and to the initial Closing Date and date on which an Extension Closing occurs (each an "Extension Closing Date"), except as the context otherwise requires.

(c)     The obligation of Buyer to purchase the Purchased Assets and to take the other actions required to be taken by Buyer at an Extension Closing is subject to the satisfaction, at or prior to the Extension Closing, of each of the following conditions (each of which may be waived by Buyer, in whole or in part):

(i)     Each of the conditions set forth in Section 10, except for the condition set forth in Section 10.8, shall have been satisfied; and

(ii)     As to the Casino or Casinos to which the Extension Closing relates, an assignment and assumption of, or court approvals for the assignment of, the Assumed Real Property Leases related to such Casino or Casinos shall have been, or at such Extension Closing will be obtained.

(d)     If an initial Closing occurs pursuant to Section 2.6(a) and fewer than all of the Casinos are acquired at such Closing then, simultaneously with the initial Closing, Buyer (or an Affiliate of Buyer approved by the Receiver, referred to herein as the "Service Supplier") and the Receiver shall enter into a service supplier agreement (the "Service Supplier Agreement"), pursuant to which the Service Supplier will provide management services to the Casinos that are retained by the Receiver. Such agreement shall be consistent with the terms and conditions set forth on the "Summary of Terms of Service Supplier Agreement" attached as Schedule 2.6(d). The parties agree that a material default, after notice and cure, under the Service Supplier Agreement by the Service Supplier shall be a material default by Buyer under this Agreement,

8

and that a material default, after notice and cure, under the Service Supplier Agreement by the Receiver shall be a material default by the Receiver under this Agreement.

## 3.  CONSIDERATION

The aggregate consideration to be paid by Buyer to the Receiver for the Purchased Assets (the "Purchase Price") shall consist of (i) an amount equal to (w) Eleven Million Seventy Thousand Dollars ($11,070,000) (the "Base Consideration Amount"), *minus* (x) the amount set forth next to any Casino that is not included in any Closing in accordance with Section 3.1(c), *plus* or *minus* (y) the Working Capital Adjustment Amount, *plus* or *minus* (z) the EBITDA Adjustment Amount, and (ii) the assumption of the Assumed Liabilities.

### 3.1  PAYMENT OF BASE CONSIDERATION AMOUNT

The Base Consideration Amount shall be paid as follows:

(a)  By the close of business on the second (2nd) Business Day after the Effective Date, Buyer will deposit One Million Dollars ($1,000,000) (including any interest from time accrued thereon, the "Deposit"), by wire transfer in immediately available funds, in a United States bank account (the "Escrow Account") controlled by U.S. Bank, National Association (the "Escrow Agent") pursuant to the Escrow Agreement by and among Buyer, the Receiver and the Escrow Agent. The Deposit will be held in escrow by the Escrow Agent and applied as set forth herein.

(b)  If the Closing occurs, then:

(i)  The Deposit (x) will be paid to the Receiver, and Buyer and the Receiver will instruct the Escrow Agent to deliver the Deposit to the Receiver (by wire transfer to one or more accounts designated by the Receiver prior to the Closing Date) at the Closing in immediately available funds, and (y) will be credited dollar for dollar against the Purchase Price;

(ii)  Buyer will pay to the Receiver (by wire transfer to an account designated by the Receiver to Buyer prior to the Closing Date) the amount of (x) Six Million Dollars ($6,000,000) *minus* (y) the Deposit (the "Cash Payment") at the Closing in immediately available funds; and

(iii)  Subject to Section 3.1(c), and on terms and conditions acceptable to each of Buyer and Fortress as set forth in the definitive Fortress Loan Documents to be entered into by FCC Lender and Buyer (or an entity that directly or indirectly owns and controls Buyer) at Closing, Buyer (or such entity that directly or indirectly owns and controls Buyer) will be indebted to FCC Lender at Closing, in an amount equal to the lesser of (A) Five Million Seventy Thousand Dollars ($5,070,000) or (B) the Base Consideration Amount (as may be adjusted pursuant to Section 3.1(c)) *minus* Six Million Dollars ($6,000,000) (the "Fortress Accommodation"). The parties acknowledge that there will be no cash payment in connection with the Fortress Accommodation by either FCC Lender or Buyer to the Receiver.

(c)  Notwithstanding the foregoing, if an initial Closing and one or more Extension Closings are to occur pursuant to Section 2.6, then the Base Consideration Amount shall be reduced as provided in Schedule 2.6(b) and the amount of the Fortress Accommodation shall be reduced accordingly dollar for dollar. If the adjustment to the Base Consideration Amount made

9

pursuant to Schedule 2.6(b) exceeds the amount of the Fortress Accommodation, then the Cash Payment shall also be reduced, dollar for dollar, to an amount that results in Buyer's delivery of the portion of the Base Consideration Amount allocable to the Purchased Assets being transferred to Buyer on the applicable Extension Closing Date.

(d)     If this Agreement is terminated pursuant to Section 12, the Deposit will be applied as specified in Section 12.

### 3.2     ASSUMED LIABILITIES

Effective as of the Closing (except as otherwise provided in Section 2.6) and subject to Buyer's obligation to pay or deposit all cure costs as provided in Section 2.3(c), the Receiver at the Closing shall assign to Buyer all of the Companies' respective interests under the Assumed Real Property Leases and the Assumed Contracts (specifically excluding the Excluded Contracts) and Buyer shall assume all liabilities and obligations of the Companies (i) then existing with respect to accounts payable to trade creditors of the Businesses incurred after the Receivership Order Date; (ii) incurred after the Receivership Order Date under the Assumed Real Property Leases and the Assumed Contracts (whether accrued as of the Closing or arising thereafter); (iii) arising in connection with the use and operation of the real property subject to the Assumed Real Property Leases and the other Purchased Assets from and after the Closing; (iv) for casino chips, pull tabs and other gaming instruments then representing a claim against the Companies' Businesses; and (v) as may be set forth or described in Schedule 3.2, solely to the extent those liabilities and obligations included in clauses (i) through (iv) are expressly included in the Actual Working Capital (the liabilities and obligations described in this Section 3.2 collectively, the "Assumed Liabilities"). The terms of Buyer's assumption of the Assumed Liabilities shall expressly include a release of any liability of the Companies for such Assumed Liabilities.

### 3.3     EXCLUDED LIABILITIES

Except for the Assumed Liabilities specifically assumed by Buyer as set forth in Section 3.2 and as otherwise expressly provided in this Agreement, Buyer is not assuming, nor shall be liable for, any other liability or obligation of the Receiver or the Companies, including, without limitation, any liabilities associated with employee benefit plans, any liabilities associated with employees of the Companies, and any liabilities of the Companies that are associated with any Excluded Contract (such other liabilities and obligations collectively, the "Excluded Liabilities"). Notwithstanding anything to the contrary in this Agreement, the Excluded Liabilities shall include, without limitation, (i) any accounts payable not included as a current liability set forth in the Actual Working Capital, (ii) except as expressly provided in Section 9.6, any liability or obligation of the Companies for Taxes, including without limitation, gaming excise taxes or payroll taxes, due and payable for all periods through and including the Closing Date except to the extent included as a current liability set forth on the Actual Working Capital and (iii) except as expressly provided in Section 9.7, any liability or obligation to any employees of each Company through and including the Closing Date, including those under any existing Plan maintained by the Companies.

10

3.4    WORKING CAPITAL ADJUSTMENT AMOUNT

Subject to Section 2.6, the Working Capital Adjustment Amount shall be calculated separately as to each Casino and paid as follows:

(a)    Not more than five (5) Business Days prior to the scheduled Closing Date, the Receiver shall in good faith prepare or cause to be prepared, and in doing so, shall reasonably cooperate and consult with Buyer, and thereafter deliver to Buyer, a computation of the estimated Working Capital of such Casino determined as of the Closing Time of such Casino (the "Close of Business") on the Closing Date (the "Estimated Working Capital"), which computation shall be prepared in accordance with the Agreed Accounting Principles and shall be consistent with the methodology agreed to between Buyer and the Receiver and attached hereto as Schedule 3.4(a). If the Estimated Working Capital exceeds One Dollar ($1.00), then in addition to the amount otherwise payable by Buyer pursuant to Section 3.1, Buyer shall pay to Receiver at the Closing an amount equal to such excess. If the Estimated Working Capital of such Casino is less than One Dollar ($1.00), Buyer shall deduct from the amount otherwise payable by Buyer pursuant to Section 3.1 an amount equal to such deficiency.

(b)    As promptly as practicable, but no later than thirty (30) days after the Closing Date, the Receiver shall in good faith prepare or cause to be prepared, and in doing so, shall reasonably cooperate and consult with Buyer, and thereafter deliver to Buyer, a computation of the actual Working Capital of such Casino determined as of the Close of Business on the Closing Date (the "Final Working Capital"), which computation will be prepared in accordance with the Agreed Accounting Principles on a basis consistent with the Estimated Working Capital.

(c)    If within thirty (30) days following delivery to Buyer of the Receiver's calculation of the Final Working Capital of such Casino, Buyer has not given the Receiver a written notice (an "Objection Notice") of Buyer's disagreement with such calculation (which notice must contain a statement of the basis of Buyer's disagreement and a reasonably detailed statement of Buyer's calculation of such Final Working Capital and which disagreement shall be limited to whether the calculation of Final Working Capital was undertaken in a manner consistent with the Agreed Accounting Principles and the terms of this Agreement and whether there were mathematical or factual errors in the calculation of such Final Working Capital), then the Final Working Capital of such Casino as set forth in the Receiver's calculation will be used in computing the Working Capital Adjustment Amount. If Buyer delivers an Objection Notice to the Receiver, Buyer and the Receiver will endeavor to resolve all disagreements noted in the Objection Notice in good faith as soon as practicable after the delivery of such Objection Notice. If such parties do not obtain a final resolution within thirty (30) days after the Receiver has received the Objection Notice, then the issues in dispute will be submitted to the Independent Accountants for resolution pursuant to the provisions of Schedule 3.4(c).

(d)    The amount of Working Capital of such Casino as of the Close of Business on the Closing Date as agreed to by Receiver and Buyer or as determined by the Independent Accountants, as applicable, pursuant to the preceding provisions of this Section 3.4 shall be final and binding on all of the parties hereto and shall be deemed the "Actual Working Capital" of such Casino for all purposes hereof.

(e)    On the third (3rd) Business Day following the final determination of the Actual Working Capital of such Casino, either (i) Buyer shall pay to the Receiver an amount equal to the amount, if any, by which the Actual Working Capital of such Casino exceeds the Estimated

11

Working Capital of such Casino, or (ii) the Receiver shall pay to Buyer an amount equal to the amount, if any, by which the Estimated Working Capital of such Casino exceeds the Actual Working Capital of such Casino. The amount paid by the Receiver to Buyer or by Buyer to the Receiver pursuant to this Section 3.4(e) is herein referred to as the "Working Capital Adjustment Amount". All payments will be made together with interest at an annual rate of five percent (5%), calculated on the basis of a 365-day year and compounded daily, beginning on the Closing Date and ending on the date of payment. Payments must be made in immediately available funds. Payments to the Receiver shall be made by wire transfer to an account as designated by the Receiver. Payments to Buyer shall be made by wire transfer to an account as designated by Buyer.

### 3.5    EBITDA ADJUSTMENT AMOUNT

(a)    Within the latest of (i) thirty (30) days after the Closing Date (or if one or more Extension Closings is to occur pursuant to Section 2.6, the Extension Closing Date upon which the last of the Purchased Assets is sold), (ii) five (5) Business Days after Receiver's receipt of the Audited Financial Statements (which will occur no later than July 31, 2010), and (iii) five (5) Business Days after the effective date of the termination of this Agreement in the event that an initial Closing has occurred and this Agreement is thereafter terminated pursuant to Section 12.1(a)(iii) or 12.1(a)(viii), the Receiver shall in good faith prepare, or cause to be prepared, and deliver to Buyer, a computation of the difference of (x) the 2009 EBITDA for all Casinos that have been acquired pursuant to this Agreement based on the unaudited financial statements prepared by Gaming Consultants for the fiscal year ended December 31, 2009 (the "Unaudited EBITDA Amount") and (y) the 2009 EBITDA for such Casinos based on the Audited Financial Statements (such difference, the "EBITDA Difference Amount"). The Unaudited EBITDA Amounts for all the Casinos is attached hereto as Schedule 3.5(a). For purposes of this Agreement, the "EBITDA Threshold Amount" shall mean the amount that is ten percent (10%) of the Unaudited EBITDA Amount.

(b)    If within thirty (30) days following delivery to Buyer of the Receiver's calculation of the EBITDA Difference Amount, Buyer has not given the Receiver an Objection Notice of Buyer's disagreement with such calculation (which notice must contain a statement of the basis of Buyer's disagreement and a reasonably detailed statement of Buyer's calculation of such EBITDA Difference Amount and which disagreement shall be limited to whether the calculation of the EBITDA Difference Amount was undertaken in a manner consistent with the Agreed Accounting Principles and the terms of this Agreement and whether there were mathematical or factual errors in the calculation of such EBITDA Difference Amount), then the EBITDA Difference Amount as set forth in the Receiver's calculation will be used in computing the EBITDA Adjustment Amount. If Buyer delivers an Objection Notice to the Receiver, Buyer and the Receiver will endeavor to resolve all disagreements noted in the Objection Notice in good faith as soon as practicable after the delivery of such Objection Notice. If such parties do not obtain a final resolution within thirty (30) days after the Receiver has received the Objection Notice, then the issues in dispute will be submitted to the Independent Accountants for resolution pursuant to the provisions of Schedule 3.4(c). The EBITDA Difference Amount as agreed to by Receiver and Buyer or as determined by the Independent Accountants, as applicable, pursuant to the preceding provisions of this Section 3.5(b) shall be final and binding on all of the parties hereto.

(c)     If the absolute value of the EBITDA Difference Amount is greater than the EBITDA Threshold Amount, then:

(i)     If the EBITDA Difference Amount is a negative number, Buyer shall pay to the Receiver an amount equal to the product of (x) five (5) and (y) the difference between (A) the EBITDA Threshold Amount and (B) the absolute value of the EBITDA Difference Amount; or

(ii)     If the EBITDA Difference Amount is a positive number, the Receiver shall pay to Buyer an amount that is equal to the amount to the product of (x) five (5) and (y) the difference between (A) EBITDA Difference Amount and (B) the EBITDA Threshold Amount; and

(iii)     Such amount to be paid by Buyer or the Receiver pursuant to this Section 3.5 shall be known as the "EBITDA Adjustment Amount".

(d)     If the absolute value of the EBITDA Difference Amount is less than or equal to the EBITDA Threshold Amount, then the EBITDA Adjustment Amount shall be Zero Dollars ($0.00).

(e)     Any payments pursuant to this Section 3.5 must be made in immediately available funds within thirty (30) days after the final determination of the EBITDA Adjustment Amount. Payments to the Receiver shall be made by wire transfer to an account as designated by the Receiver. Payments to Buyer shall be made by wire transfer to an account as designated by Buyer.

(f)     Solely for illustrative purposes, an example of the calculation of the EBITDA Adjustment Amount is set forth on Schedule 3.5(f) hereto.

3.6     ALLOCATION OF PURCHASE PRICE

(a)     Not more than five (5) Business Days prior to the scheduled Closing Date, the Receiver shall in good faith prepare or cause to be prepared, and in doing so, shall reasonably cooperate and consult with Buyer, and thereafter deliver to Buyer on behalf of each Company a schedule (each, an "Allocation Schedule") allocating the applicable portion of the Purchase Price among the various assets comprising the Purchased Assets of that Company that are to be conveyed by Receiver to Buyer in accordance with Treasury Regulation 1.1060-1 (or any comparable provisions of state or local Tax Law) or any successor provision and the allocation methodology set forth in Schedule 3.6. The procedures set forth in this Section 3.6 shall be applied separately with respect to each Allocation Schedule. If there is an initial Closing and one or more Extension Closings pursuant to Section 2.6, then the procedures set forth in this Section 3.6 shall be applied separately with respect to the Purchased Assets conveyed to Buyer at each such Closing or Extension Closing.

(b)     Unless the Receiver and Buyer have previously agreed upon the manner in which the Purchase Price (to the extent not allocated to Class I through Class IV Assets pursuant to Schedule 3.6) is to be allocated among Class V Assets (furniture, fixtures and equipment, leasehold improvements and other Class V assets), Class VI Assets (licenses, permits, trade name and other intangibles described in Section 197 of the Internal Revenue Code, excluding goodwill and going concern value) and Class VII Assets (goodwill and going concern value), the

13

Allocation Schedule will only set forth the allocations of the Purchase Price among the Purchased Assets of that Company that are Class I through Class IV Assets. At such time as both the Final Working Capital and the EBITDA Adjustment Amount are determined pursuant to Sections 3.4 and 3.5, respectively, or, if later, at such time as Buyer and Receiver agree upon the allocation of the Purchase Price to Class V Assets, Class VI Assets and Class VII Assets pursuant to Section 3.6(d) below or the Independent Accountants have made a final determination pursuant to Section 3.6(e) below, the Receiver shall in good faith prepare or cause to be prepared, and in doing so, shall reasonably cooperate and consult with Buyer, and thereafter deliver to Buyer a revised Allocation Schedule (the "Final Allocation Schedule") for each Company that (i) reflects any changes to the allocation of the Purchase Price among the Purchased Assets in Classes I through IV for such Company as a result of any changes between the Estimated Working Capital and the Final Working Capital and (ii) reflects the allocation of the Purchase Price (to the extent not allocated to Class I through Class IV Assets) among Class V Assets, Class VI Assets and Class VII Assets of such Company as determined pursuant to Section 3.6(c), Section 3.6(d) or Section 3.6(e) below, as applicable.

(c)     No later than two (2) Business Days after such time as both the Final Working Capital and the EBITDA Adjustment Amount are determined pursuant to Sections 3.4 and 3.5, respectively, Buyer shall prepare, or cause to be prepared, and deliver to Receiver a proposed allocation of the Purchase Price (to the extent not allocated to Class I through Class IV Assets) among Class V Assets, Class VI Assets and Class VII Assets for each Company ("Buyer's Proposed Allocation"). Upon the Receiver's request, Buyer agrees to provide to the Receiver all documentation supporting Buyer's Proposed Allocation. If the Receiver objects to Buyer's Proposed Allocation with respect to a Company, Buyer and the Receiver will negotiate in good faith to resolve such objections.

(d)     If, within ten (10) days after receipt by the Receiver of Buyer's Proposed Allocation with respect to a Company, Buyer and the Receiver agree upon the allocation of the Purchase Price among Class V Assets, Class VI Assets and Class VII Assets of such Company, the applicable Final Allocation Schedule shall reflect the agreed upon allocation, and Buyer and Receiver, to the extent the Receiver has the authority to do so, shall (i) report and file all Tax Returns (including any amended Tax Returns and claims for refund) consistent with the Purchase Price allocation set forth in the Final Allocation Schedule and (ii) take no position contrary to or inconsistent with such Final Allocation Schedule (including in any audits or examinations by any taxing authority or any other proceedings). Buyer and the Receiver, to the extent the Receiver has the authority to do so, shall file or cause to be filed any and all forms (including U.S. Internal Revenue Service Form 8594), statements and schedules with respect to such allocation, including any required amendments to such forms.

(e)     If Buyer and the Receiver are unable to agree upon the manner in which the Purchase Price (to the extent not allocated to Class I through Class IV Assets) should be allocated among Class V Assets, Class VI Assets and Class VII Assets with respect to a Company within ten (10) days after receipt by the Receiver of Buyer's Proposed Allocation with respect to such Company, then any disputed allocation among Class V Assets, Class VI Assets and Class VII Assets shall be finally and conclusively determined by the Independent Accountants in accordance with Section 1060 of the Internal Revenue Code. For the avoidance of doubt, the Independent Accountants shall not have the authority to change the allocations of the Purchase Price among Class I through Class IV Assets. Promptly, but not later than ten (10)

days after acceptance of its appointment hereunder, the Independent Accountants shall determine only those matters pertaining to the allocation among Class V Assets, Class VI Assets and Class VII Assets in dispute and shall render a written report as to the disputed matters and the resulting allocation, and such report of the Independent Accountants shall be final, conclusive and binding upon Buyer and the Receiver, and such parties shall report and file all Tax Returns as contemplated by, and shall otherwise comply with, the preceding paragraph. The Final Allocation Schedule of the applicable Company shall incorporate the results of the Independent Accountant's determination. The fees and disbursements of the Independent Accountants shall be borne solely by the Receiver. Notwithstanding any other provisions of this Agreement, the provisions of this Section 3.6 shall survive the initial Closing and any Extension Closing.

## 4.     CLOSING TRANSACTIONS

### 4.1     CLOSING

The closing of the purchase and sale of the Purchased Assets (the "Closing") will occur at such time and place as the parties shall agree upon in writing but in any event no later than five (5) Business Days following satisfaction or waiver of the last to be fulfilled of the conditions in Sections 10 and 11 (other than those conditions that by their nature are to be satisfied at Closing, but subject to the satisfaction or waiver of such conditions), except in each case as otherwise provided in Section 2.6. The date on which the Closing is actually held is the "Closing Date."

### 4.2     OBLIGATIONS OF THE RECEIVER AT CLOSING

At the Closing, subject to Section 2.6, the Receiver will deliver each of the following to Buyer:

(a)     A Bill of Sale and Assignment and Assumption Agreement, duly executed by the Receiver substantially in the form attached hereto as Exhibit B, pursuant to which the Receiver transfers to Buyer the Companies' rights, titles and interests in and to the Purchased Assets, including but not limited to the Assumed Real Property Leases and the Assumed Contracts, and Buyer shall assume the Assumed Liabilities (the "Bill of Sale and Assignment and Assumption Agreement");

(b)     As to each Assumed Real Property Lease, and to the extent required, each Assumed Contract, either (i) the written consent of the lessor or counterparty under such Assumed Real Property Lease or Assumed Contract to the assignment thereof by the applicable Company and the assumption thereof by Buyer, or (ii) alternatively, an Order of a court of competent jurisdiction authorizing such assumption and assignment;

(c)     A Trademark and Servicemark Assignment Agreement for each Company whose Business is acquired at the Closing, duly executed by the Receiver substantially in the form attached hereto as Exhibit C, pursuant to which, among other things, the Receiver transfers to Buyer any and all of the Receiver's (and each such Company's) right, title and interest in certain trademarks and servicemarks used in connection with such Company's Business (the "Trademark Agreements");

15

(d)     A Domain Name Transfer Agreement for each Company whose Business is acquired at the Closing, duly executed by the Receiver substantially in the form attached hereto as <u>Exhibit D</u>, pursuant to which the Receiver transfers to Buyer any and all of the Receiver's (and each such Company's) right, title and interest in and to certain registered domain names of each such Company used in connection with such Company's Business (the "<u>Domain Name Agreements</u>");

(e)     Each Change Form (as defined in Section 9.13(b)) for each Company whose Business is acquired at the Closing and, at the initial Closing, each Change Form for Little Nevada II, Inc. and Little Nevada III, Inc. described in Section 9.13(b);

(f)     Keys necessary to access each of the properties under the Assumed Real Property Leases; and

(g)     All other instruments and documents that are necessary, in the reasonable opinion of Buyer and its counsel, to fulfill the obligations of the Receiver under this Agreement that are required to be fulfilled on or prior to the Closing Date and to evidence satisfaction of any conditions to the Closing referred to herein.

4.3     OBLIGATIONS OF BUYER AT CLOSING

At the Closing, subject to Section 2.6, Buyer will deliver to the Receiver each of the following:

(a)     The balance of the Base Consideration Amount, as contemplated by Section 3.1, and any additional amount payable by Buyer pursuant to the penultimate sentence of Section 3.4(a);

(b)     Two counterpart originals of the Bill of Sale and Assignment and Assumption Agreement, duly executed by Buyer;

(c)     Two counterpart originals of the Trademark Agreement, duly executed by Buyer;

(d)     Two counterpart originals of the Domain Name Agreements, duly executed by Buyer;

(e)     Evidence satisfactory to the Receiver that Buyer has received all approvals of Governmental Authorities necessary for (i) Buyer to consummate the transactions contemplated by this Agreement, including but not limited to, Buyer's purchase and acquisition of the Purchased Assets (including but not limited to the assumption of the Assumed Real Property Leases and Assumed Contracts) and (ii) Buyer to legally operate the Businesses, including the enhanced card rooms in the State of Washington, including, without limitation, all regulatory approvals and Consents needed from the WSGC and the WSLCB (whether annual licenses, temporary or provisional licenses, commitment letters or otherwise, as determined by the Receiver) and from all other Governmental Authorities having jurisdiction for such operations (the approvals described in this Section 4.3(e) collectively the "<u>Required Governmental Approvals</u>"); and

(f)     All other instruments and documents that are necessary, in the reasonable opinion of the Receiver and its counsel, to fulfill the obligations of Buyer under this Agreement that are required to be fulfilled on or prior to the Closing Date and to evidence satisfaction of any conditions to the Closing referred to in this Agreement.

## 5.     PRESERVATION OF LIENS; PROCEEDS HELD FOR BENEFIT OF CREDITORS

The properties, assets and rights of the Companies (including but not limited to the Purchased Assets) are currently subject to perfected liens in favor of Fortress. The parties acknowledge that the Deposit, to the extent it becomes a part of the receivership estate, is proceeds, products, offspring or profits of the properties, assets and rights of the Companies which are subject to Fortress's existing perfected liens and any liens (including, without limitation, Fortress's liens) will attach to the Deposit and, from and after such time as the same and all additional amounts, if any, in respect of the Purchase Price are paid to the Receiver, the amounts so paid, and such liens will retain their existing priority with the same validity, priority, force and effect which they have with respect to the properties, assets and rights of the Companies. Following the Closing and each Extension Closing, if any, the Receiver will disburse the proceeds from the sale of the Purchased Assets in accordance with the Approval Orders and other applicable orders of the Canadian Court. The Receiver acknowledges that none of the aforementioned Fortress liens shall limit Buyer's right to the Deposit pursuant to, and as described in, Section 12.2 below, nor shall any such liens continue to encumber the Deposit if the same is delivered Buyer pursuant to such Section.

## 6.     LICENSING APPLICATIONS

Within ten (10) days after the Effective Date, Buyer shall (i) complete and file with the WSGC and the WSLCB all such applications and other materials, and pay all fees and such other amounts, as shall be required by the WSGC and the WSLCB and under other applicable Law in order for Buyer to obtain the Required Governmental Approvals from the WSGC and the WSLCB and (ii) deliver to the Receiver evidence satisfactory to the Receiver of the filing of such materials and the payment of such fees and other amounts.

## 7.     REPRESENTATIONS AND WARRANTIES OF THE RECEIVER

The Receiver hereby represents and warrants to Buyer as of the Effective Date and the Closing Date, as follows:

### 7.1     AUTHORITY; NO CONFLICT

Subject to the approval of this Agreement by the Canadian Court and the Bankruptcy Court, applicable provisions of the CCAA and the U.S. Bankruptcy Code and entry of the Approval Orders, to the Receiver's Knowledge:

(a)     All action on the part of the Receiver necessary for the authorization, execution and delivery of this Agreement, the sale and delivery of the Purchased Assets, and the performance of all of the Receiver's obligations under this Agreement has been taken; and

(b)    This Agreement has been duly executed and delivered by the Receiver pursuant to the Receiver's express court authority and (assuming the due authorization, execution and delivery hereof by Buyer) is a valid and binding obligation of the Receiver, enforceable against the Receiver in accordance with the terms hereof, except to the extent that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar requirements of Law relating to creditors' rights generally and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

## 7.2    BROKERS OR FINDERS

The Receiver has not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, and the Receiver will indemnify and hold Buyer harmless from any such payment alleged to be due by the Receiver as a result of the action of the Receiver or its officers or employees, which indemnification will survive the Closing or the termination of this Agreement.

EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 7, THE RECEIVER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS (INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS OR THAT IS THE SUBJECT OF ANY LEASE OR CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE PURCHASED ASSETS, THE TERMS, AMOUNT, VALIDITY, COLLECTABILITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES OR ASSUMED REAL PROPERTY LEASE OR OTHER LEASE OR CONTRACT, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR USE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF). THE RECEIVER HEREBY DISCLAIMS ANY WARRANTY (EXPRESS OR IMPLIED) OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE AS TO ANY PORTION OF THE PURCHASED ASSETS.

## 8.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Receiver as of the Effective Date and the Closing Date as follows:

## 8.1    ORGANIZATION AND GOOD STANDING

Buyer is a limited liability company duly organized, validly existing, and in good standing under the Laws of the State of Washington.

## 8.2    AUTHORITY; NO CONFLICT

Buyer has all requisite limited liability company power and authority to execute and deliver the Agreement, to purchase the Purchased Assets and assume the Assumed Liabilities hereunder and to carry out and perform Buyer's obligations under this Agreement. All action on the part of Buyer necessary for the authorization, execution, delivery and performance of this Agreement by Buyer, the purchase of the Purchased Assets and assumption of the Assumed Liabilities, and the performance of all obligations of Buyer under the Agreement, has been taken. This Agreement has been duly executed and delivered by Buyer and (assuming the due authorization and delivery hereof by the Receiver) is a valid and binding obligation of Buyer, enforceable against Buyer in accordance with this Agreement's terms, except to the extent that such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar requirements of Law relating to creditors' rights generally and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law). The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement by Buyer will not (a) conflict with or result in a breach of any provision of the articles of organization or operating agreement of Buyer, (b) violate any existing provision of applicable Law or any existing order, rule, regulation, judgment or decree of any Governmental Authority applicable to Buyer, (c) conflict with or result in a breach or violation of any term or provision of, or constitute a default under, any agreement, instrument or writing to which Buyer is a party, or by which Buyer may be bound, or (d) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Buyer, except in each case for such conflicts, breaches, violations or defaults as will not have a material adverse effect on the ability of Buyer to perform its obligations under this Agreement.

## 8.3    CERTAIN PROCEEDINGS

There is no pending Proceeding that has been commenced against Buyer and that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the transactions contemplated by this Agreement. To Buyer's Knowledge, no such Proceeding has been threatened or is contemplated.

## 8.4    AS-IS, WHERE IS PURCHASE

BUYER ACKNOWLEDGES THAT ITS AND ITS REPRESENTATIVES HAVE RECEIVED OR BEEN AFFORDED THE OPPORTUNITY TO REVIEW, AND HAVE REVIEWED, PRIOR TO THE DATE OF THIS AGREEMENT, ALL MATERIALS THAT BUYER HAS REQUESTED THE RECEIVER TO DELIVER OR MAKE AVAILABLE, AS THE CASE MAY BE, TO BUYER AND ITS REPRESENTATIVES IN CONNECTION WITH ENTERING INTO THIS AGREEMENT. BUYER ACKNOWLEDGES THAT IT IS INFORMED AS TO THE RISKS OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT AND THE OWNERSHIP OF THE PURCHASED ASSETS, THAT BUYER IS PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS BASED SOLELY UPON ITS INDEPENDENT INSPECTIONS AND INVESTIGATIONS OF SUCH ASSETS, AND THAT BUYER WILL BE PURCHASING THE PURCHASED ASSETS AT CLOSING ON AN "AS IS, WHERE IS" BASIS, WITH NO REPRESENTATIONS OR WARRANTIES OF ANY KIND (EXPRESS OR IMPLIED, AT COMMON LAW, BY

STATUTE, OR OTHERWISE) EXCEPT AS SPECIFICALLY SET FORTH IN SECTION 7. BUYER HAS NOT RELIED UPON, AND WILL NOT RELY UPON, ANY REPRESENTATION OR WARRANTY OF THE RECEIVER, ITS REPRESENTATIVES OR ANY OTHER PERSON, EXCEPT AS EXPRESSLY SET FORTH IN SECTION 7. NONE OF THE RECEIVER, ANY COMPANY , ANY REPRESENTATIVE OF THE RECEIVER OR ANY COMPANY OR ANY OTHER PERSON WILL HAVE OR BE SUBJECT TO ANY LIABILITY TO BUYER OR ANY OTHER PERSON RESULTING FROM THE DISTRIBUTION TO BUYER OR ITS REPRESENTATIVES OF, OR ANY SUCH PERSON'S USE OF, ANY SUCH INFORMATION, INCLUDING ANY CONFIDENTIAL MEMORANDA DISTRIBUTED RELATING TO THE PURCHASED ASSETS OR THE COMPANIES OR OTHER PUBLICATIONS OR DATA ROOM INFORMATION PROVIDED TO BUYER OR ITS REPRESENTATIVES, OR ANY OTHER DOCUMENT OR INFORMATION IN ANY FORM PROVIDED TO BUYER OR ITS REPRESENTATIVES IN CONNECTION WITH THE SALE OF THE PURCHASED ASSETS AND THE OTHER TRANSACTIONS CONTEMPLATED HEREBY.

8.5    FORECASTS AND PROJECTIONS

Without limiting the generality of Section 8.4, Buyer acknowledges that any forecasts or projections included in any due diligence or similar materials are not to be viewed as facts and that actual results achieved by the Companies during the period or periods covered by any such forecasts or projections may vary materially from those contained in such forecasts or projections, and that none of the Companies, the Receiver, any other Person or any of their respective Representatives has made any representation or warranty concerning any future revenues, costs, expenditures, cash flows, results of operations, financial condition or prospects of any of the Companies or the Purchased Assets.

8.6    LICENSING

NG Washington, LLC, a Washington limited liability company and an Affiliate of Buyer, is licensed with the WSGC and the WSLCB and all such licenses are in good standing.

8.7    SUFFICIENT FUNDS

As of the Effective Date, subject to the Fortress Accommodation, Buyer has (and will have on the Closing Date and each Extension Closing Date, if any) the financial capability and all of the funds required in order to complete the transactions contemplated by this Agreement, on the terms contained in this Agreement and to timely perform and discharge the obligations of Buyer under this Agreement.

8.8    BROKERS OR FINDERS

Neither Buyer nor any of its respective agents have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, and Buyer will indemnify and hold the Receiver and the Companies harmless from any such payment alleged to be due by or through Buyer as a result of the action of Buyer or any of its respective officers or agents, which indemnification will survive the Closing, each Extension Closing, if any, or the termination of this Agreement.

20

9. **COVENANTS OF THE PARTIES**

9.1 REGULATORY APPROVALS

Buyer expressly agrees to use its commercially reasonable efforts to obtain all of the Required Governmental Approvals. In furtherance of the foregoing (but without limiting the provisions of Section 6), after the Effective Date, Buyer shall promptly file, and cause all applicable owners and officers of Buyer to file, all appropriate applications and notices with the WSGC, the WSLCB, and such other Governmental Authorities as may be necessary to implement this covenant. Upon Buyer's written request, the Receiver shall use commercially reasonable efforts to take such actions as Buyer shall reasonably request in order to facilitate Buyer's obtaining the Required Governmental Approvals; *provided, however,* that all such actions shall be taken by the Receiver at Buyer's sole cost and expense and that the Receiver shall not be obligated to incur any liability or obligations in connection herewith.

9.2 PRESERVATION OF BUSINESS

Except (i) as required by applicable Law, (ii) as otherwise expressly contemplated by this Agreement, (iii) as approved by the Canadian Court and/or the Bankruptcy Court, as applicable, or (iv) with the prior written consent of Buyer, the Receiver shall, until the Closing and taking into account the CCAA Proceeding and the U.S. Proceeding, and subject in each case to Section 9.4(d) and the ability of the Receiver thereunder to consider and accept Other Offers, use commercially reasonable efforts to cause the Companies:

(a) To operate their respective Businesses in the ordinary and usual course of business, including with respect to maintaining marketing and promotional efforts and, subject to employee turn-over in the ordinary course of business, maintaining the number of employees of the Companies;

(b) Not to sell, lease, or otherwise transfer or dispose of any of their material Purchased Assets, and not to agree or commit to do any of the foregoing, other than transfers and dispositions in the ordinary course of business; and

(c) To maintain in full force and effect until the Closing Date and each Extension Closing Date, if any, substantially the same levels of insurance coverage for the Companies that are in effect as of the Effective Date.

9.3 ACKNOWLEDGEMENT OF INFORMATION PROVIDED

Buyer hereby acknowledges and expressly agrees (i) that it and its respective Representatives have been permitted full and complete access to, and have inspected the books and records, tax returns, contracts, insurance policies (or summaries thereof) and other properties and assets of the Companies that Buyer or its respective Representatives have deemed necessary or desirable in connection with Buyer's execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, (ii) that no further inspection or due diligence is a condition to complete the transactions contemplated hereby, and (iii) that Buyer has completed Buyer's due diligence investigation.

21

9.4     COURT APPROVAL PROCEDURES

(a)     Following execution and delivery of this Agreement, the Receiver shall seek entry of an order with the Bankruptcy Court establishing procedures for the assumption and assignment of executory contracts and leases (including establishing cure amounts), approving the Breakup Fee, for conduct of the hearing on approval of this Agreement, and the procedures for consideration and acceptance of other offers for the Purchased Assets in substantially the form attached hereto as <u>Schedule 9.4(a)</u> (the "<u>Bidding Procedures Order</u>"), *provided, however,* that any material changes to the form attached as <u>Schedule 9.4(a)</u> must be approved by Buyer, which approval shall not be unreasonably withheld; *provided further, however,* that no changes to the amount or manner of payment of the Breakup Fee may be made to the Bidding Procedures Order in any manner whatsoever without the consent of Buyer, which consent may be withheld in Buyer's sole discretion.  Prior to filing an application for entry of such an order, the Receiver shall provide, or cause its counsel to provide, to Buyer and its counsel a copy of the application, or motion papers and a reasonable opportunity to comment on the same; *provided, however,* that any such comments of Buyer or its counsel shall not limit the Receiver's right to determine the content of any such pleading in its sole discretion.

(b)     Following the execution and delivery of this Agreement, the Receiver shall apply to the Canadian Court for an order (the "<u>Canadian Approval Order</u>") in a form mutually acceptable to Buyer and the Receiver that, among other things, (i) approves the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and authorizes the Receiver to proceed with the transactions contemplated by this Agreement, subject to entry of the U.S. Approval Order, (ii) provides that upon consummation of the Closing, and each Extension Closing, if any, all Liens on the Purchased Assets then conveyed to Buyer shall attach to the Purchase Price proceeds then paid to the Receiver in the same order of priority as such Liens attached to the Purchased Assets, and (iii) further provides for disbursement of the Purchase Price following the Closing.

(c)     In addition to the application to the Canadian Court for the Canadian Approval Order, the Receiver shall promptly seek and request the earliest available hearing date for approval from the Bankruptcy Court for an order (the "<u>U.S. Approval Order</u>") in substantially the form attached hereto as <u>Schedule 9.4(c)</u> that, among other things, (i) confirms and approves the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and the Canadian Approval Order, and authorizes the Receiver to implement the transactions contemplated by this Agreement (subject to modifications and conditions, if any, made in or pursuant to the Canadian Approval Order), (ii) provides that to the extent permissible by applicable Canadian Law and the applicable provisions of the U.S. Bankruptcy Code, the sale of the Purchased Assets to Buyer shall be free and clear of all interests pursuant to Section 363(f) of the U.S. Bankruptcy Code (including, without limitation, any and all Liens on the Purchased Assets), (iii) provides that, to the extent permissible by applicable Canadian Law and the applicable provisions of the U.S. Bankruptcy Code, all such interests, including without limitation obligations and liabilities of any kind, absolute, contingent or otherwise, of the Companies (other than the Assumed Liabilities) and all Liens on the Purchased Assets, shall attach to the proceeds of the sale hereunder in the same rank and priority as they had in the Purchased Assets, and (iv) approves the Companies' assumption of the Assumed Real Property Leases and the Assumed Contracts and the assignment of the same to Buyer pursuant to

22

applicable Canadian receivership Law and Section 365 of the U.S. Bankruptcy Code; *provided, however,* that any material changes to the form attached as <u>Schedule 9.4(c)</u> must be approved by Buyer, which approval shall not be unreasonably withheld.

(d)     Buyer acknowledges and expressly agrees that (i) the Receiver is obligated to solicit, and has solicited, offers from other prospective purchasers for the sale of the Purchased Asserts or the shares of capital stock of the Companies in accordance with applicable Law, (ii) in connection with the CCAA Proceeding and the U.S. Proceeding, the Receiver is required to and will consider other offers for the stock and/or assets of the Companies (each, an "<u>Other Offer</u>"), and (iii) the Canadian Court or the Bankruptcy Court may approve a purchase and sale transaction with, or other disposition of the Purchased Assets or capital stock of the Companies to, another party and the Receiver may elect to forego the transaction contemplated by this Agreement and enter into such other transaction without being in breach of any obligation of the Receiver hereunder, subject to the provisions of Section 12.5.

(e)     Buyer acknowledges that a condition precedent to the Receiver's obligation to file the papers necessary to seek the Bidding Procedures Order, the Canadian Approval Order and the U.S. Approval Order is the delivery by Buyer to the Receiver of financial and other information necessary to establish that the Buyer can provide landlords under the Assumed Real Property Leases and counterparties to the Assumed Contracts with adequate assurance of future performance by Buyer. Without limiting the foregoing, Buyer shall promptly take (at its sole cost and expense) all such actions as are reasonably requested by the Receiver to assist in obtaining entry of the Bidding Procedures Order and the Approval Orders and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement or other documents or information for filing with the Canadian Court and/or the Bankruptcy Court for the purposes, among others, of (i) providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the U.S. Bankruptcy Code; and (ii) making the employees, officers and representatives of Buyer, as applicable, available (at reasonable times and upon reasonable prior notice) to be interviewed by the attorneys and solicitors of the Receiver and to testify before the Canadian Court and/or the Bankruptcy Court and at depositions, with respect to demonstrating adequate assurance of future performance by Buyer under any Assumed Real Property Lease or Assumed Contract.

(f)     In furtherance of the obligations of Buyer pursuant to Section 9.4(e) above, concurrently with the execution and delivery of this Agreement, Buyer shall provide the Receiver with Buyer's most recent financial statements and other information and documentation (including, without limitation, regarding any contemplated third party financing) that demonstrate, in Receiver's reasonable discretion, that Buyer has the financial wherewithal to consummate the transactions contemplated by this Agreement, and such financial statements shall be certified by Buyer's Chief Executive Officer and Chief Financial Officer as being true and correct in all material respects and as fairly reflecting the operations and capital transactions of Buyer during the periods covered thereby.

23

9.5    NOTIFICATION

Between the Effective Date and the Closing Date (or if one or more Extension Closings is to occur pursuant to Section 2.6, the last Extension Closing Date), (i) the Receiver shall promptly notify Buyer in writing if the Receiver becomes aware of any fact or condition that makes the satisfaction of the conditions in Section 10 impossible or unlikely, and (ii) Buyer shall promptly notify the Receiver in writing if Buyer becomes aware of (x) any fact or condition that makes the satisfaction of the conditions in Section 11 impossible or unlikely or (y) any change in the financial position of Buyer that could affect Buyer's ability to perform any of its obligations pursuant to this Agreement including, without limitation, closing the transactions contemplated by this Agreement.

9.6    TRANSFER TAXES; PROPERTY TAXES

(a)    Except as set forth in Section 9.6(b), Buyer will be liable for and will pay, or will cause to be paid, all United States federal, state or local sales, use, purchase, excise, transfer, intangible, stamp, or similar taxes (collectively, "Transfer Taxes") payable under any applicable Law on or with respect to the transactions contemplated by this Agreement (including without limitation, the sale of the Purchased Assets and the assumption of the Assumed Liabilities). Buyer will prepare and file all affidavits or returns, if any, required in connection with the foregoing at Buyer's own cost and expense. Without limiting the foregoing, at each Closing or Extension Closing, Buyer will deliver to the Escrow Agent (i) a completed Washington State Department of Revenue Consumer Use Tax Return ("Use Tax Return") for each Company to which such Closing applies reflecting a use tax liability equal to the agreed value of Class V assets of that Company other than leasehold improvements, pursuant to the Allocation Schedule for such Company, multiplied by the applicable tax rate(s) and (ii) cash, without reduction of the Purchase Price, in an amount equal to the total amount of "Total Use Tax Due" reflected on all Use Tax Returns, which returns and cash amounts the Escrow Agent shall, pursuant to the Escrow Agreement, remit to the Washington State Department of Revenue.

(b)    Buyer will prepare all Real Estate Excise Tax Affidavits at Buyer's own cost and expense. At each Closing or Extension Closing, Buyer will deliver to the Escrow Agent (i) a completed Real Estate Excise Tax Affidavit for each Company to which such Closing applies if such Company holds tenant-owned leasehold improvements, which affidavit will reflect the agreed value of such leasehold improvements pursuant to the Allocation Schedule for such Company, and (ii) cash, without reduction of the Purchase Price, in an amount equal to fifty percent (50%) of the total amount of Real Estate Excise Tax Due pursuant to all such Real Estate Excise Tax Affidavits; and at each such Closing or Extension Closing, the Receiver will deliver to the Escrow Agent cash in an amount equal to fifty percent (50%) of the total amount of Real Estate Excise Tax Due pursuant to all such Real Estate Excise Tax Affidavits. The Escrow Agent shall, pursuant to the Escrow Agreement, remit all returns and cash amounts to the recording office of the county in which such Company's tenant-owned leasehold improvements are located.

(c)    The parties agree that any adjustment pursuant to Sections 3.4 and 3.5 shall not impact the amounts allocated to Class V assets for purposes of the Purchase Price allocation under Section 3.6 or this Section 9.6. To the extent that, notwithstanding the foregoing, any additional Transfer Taxes are required to be paid by or are imposed upon any Company or the

24

Receiver, Buyer will reimburse that Company or the Receiver, as applicable, for such taxes within five (5) Business Days after payment of such taxes by such Company or the Receiver, as the case may be. All Transfer Taxes payable by Buyer pursuant to this Agreement shall be in addition to all other amounts payable by Buyer pursuant to this Agreement.

(d)     Notwithstanding anything to the contrary herein, (i) at each Closing or Extension Closing, ad valorem taxes relating to the Purchased Assets that are conveyed to Buyer at each such Closing or Extension Closing, which taxes have been paid for, or are normally due and payable in, the current calendar year shall be prorated between Buyer and the Receiver (based on the number of days in the year occurring before the applicable Closing Date or Extension Closing Date and the number of days in the year occurring on or after such Closing Date), such prorated amounts to be reflected as appropriate in the Final Working Capital, and (ii) Buyer shall be liable for and shall pay any ad valorem taxes normally due and payable in years after the calendar year in which such Closing Date occurs but for which the due date is accelerated to a date on or before such Closing Date on account of the transactions contemplated by this Agreement. Accordingly, at each Closing or Extension Closing, Buyer and/or the Receiver, as applicable, shall deliver to the Escrow Agent cash equal to the amount of such taxes necessary to satisfy the allocation and/or proration of such taxes as provided in this Section 9.6(d) and for which invoices and assessments have been received. With respect to personal property taxes attributable to the Purchased Assets title to which is transferred to Buyer on the Closing Date or the Extension Closing Date, as applicable, Buyer shall, and the Receiver to the extent the Receiver has authority to do so shall cause the Companies to, file prior to such Closing all notices of sale, advance tax requests or similar notices with the appropriate Governmental Authorities.

9.7     EMPLOYEE MATTERS

(a)     Not less than three (3) Business Days prior to the scheduled Closing or Extension Closing, as applicable, the Receiver shall deliver to Buyer a list of all current employees of the Companies to which such Closing relates. Buyer shall use commercially reasonable efforts to offer employment, commencing as of the Closing or the Extension Closing, as applicable, and continuing for a period of at least six (6) months thereafter, to substantially all employees of the Companies (but not necessarily substantially all employees of each Company) providing services at the Casino or Casinos, title to which is then transferred to Buyer, as of such time, in each case on terms and conditions substantially equivalent to the terms and conditions on which such persons are then employed by the Companies; *provided, however,* that with respect to a Company that has 50 or more "full-time employees" as defined in the WARN Act, Buyer will hire and retain a sufficient number of employees on terms and conditions such that WARN Act liability is not incurred as a result of the transactions contemplated by this Agreement. Those employees who commence employment by Buyer as of the Closing Date or any applicable Extension Closing Date shall be collectively referred to as the "Buyer Employees."

(b)     Buyer shall give Buyer Employees full credit for purposes of eligibility and vesting and benefit accrual (other than benefit accrual under a defined benefit pension plan) under the employee benefit plans or arrangements maintained by Buyer in which such Buyer Employees participate for such Buyer Employees' service with the Companies (or any of them).

(c)     The Receiver and Buyer shall cooperate to comply with and minimize any obligations arising under the WARN Act in connection with any (i) plant closing (as defined in

the WARN Act) affecting any site of employment or one or more facilities or operating units within any site of employment of the Companies; (ii) mass-layoff (as defined in the WARN Act) affecting any site of employment of the Companies; or (iii) similar action under the WARN Act requiring notice to employees in the event of an employment loss or layoff.

(d)     The Receiver shall pay wages and salaries of the employees of the Companies incurred prior to the Closing Date or any applicable Extension Closing Date and any amounts for bonuses earned prior to the Closing Date and for paid time off or vacation accrued prior to the Closing Date or any applicable Extension Closing Date.

(e)     On the thirty-first (31st) day after the Closing Date and any applicable Extension Closing Date, Buyer will advise the Receiver which employees listed in Schedule 9.7(e) are still employed by Buyer as of such time, so that the Receiver may pay any retention bonuses that have been earned by such employees, which retention bonuses shall not exceed the total amount set forth in Schedule 9.7(e).

(f)     Notwithstanding any of the foregoing to the contrary, none of the provisions contained herein shall operate to duplicate any benefit provided to any Buyer Employee. No provision of this Agreement shall create any third-party beneficiary rights in any employee or former employee of any Company or any other Person (including any beneficiary or dependent thereof), in respect of continued employment (or resumed employment) for any specified period of any nature or kind whatsoever.

9.8     INVENTORY OF GAMBLING EQUIPMENT AND LIQUOR

(a)     Within ten (10) Business Days after the Effective Date, the Receiver and the Buyer shall jointly prepare a schedule of the material assets (other than Excluded Assets) located at each Casino, including inventories of the Casinos' gambling equipment sufficient to satisfy the applicable requirements of Washington Administrative Code Section 230-06-110.

(b)     Immediately prior to the Closing or the Extension Closing, as applicable, the Receiver and Buyer shall conduct a physical count of the inventory of the Casino or Casinos that are the subject of the Closing or Extension Closing, as applicable, and prepare a record of the gambling equipment and a detailed inventory of the liquor included in the Purchased Assets to be so transferred to Buyer. Buyer shall report to the WSGC the transfer of such gambling equipment to Buyer pursuant hereto, including a copy of the applicable inventory record, in accordance with Washington Administrative Code Section 230-06-110(6), and (subject to Buyer's obtaining all Required Governmental Approvals with respect thereto), shall purchase such liquor inventory from the Receiver at the then fair market value thereof, which price the parties acknowledge they have negotiated and agreed to.

9.9     BUYER'S PROVISION OF ADDITIONAL FINANCIAL INFORMATION

Following the Effective Date, and in addition to Buyer's separate obligation pursuant to Section 9.4(f), Buyer will provide to the Receiver within five (5) Business Days following any written request from Receiver, such further relevant financial and other information (including, without limitation, adequate assurances as to performance and information and documentation regarding any contemplated third party financing) demonstrating to the Receiver that, in the Receiver's reasonable judgment, Buyer has and continues to have the financial wherewithal to consummate the transactions contemplated by this Agreement.

26